IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

SHIRLEY M. AWE,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C13-0062

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.    *INTRODUCTION* .................................... 2

II.   *PROCEDURAL BACKGROUND* .......................... 2

III.  *PRINCIPLES OF REVIEW* ............................. 3

IV.  *FACTS* ............................................. 5
    A.   *Awe's Education and Employment Background* ........ 5
    B.   *Administrative Hearing Testimony* .................. 5
       1.   *Awe's Testimony* ............................... 5
       2.   *Vocational Expert's Testimony* .................. 7
    C.   *Awe's Medical History* ............................. 8

V.   *CONCLUSIONS OF LAW* ............................... 10
    A.   *ALJ's Disability Determination* ..................... 10
    B.   *Objections Raised By Claimant* ...................... 12

VI.  *CONCLUSION* ....................................... 17

VII. *ORDER* ............................................. 17

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Shirley M. Awe on June 19, 2013, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Awe asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Awe requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 7, 2010, Awe applied for disability insurance benefits. In her application, Awe alleged an inability to work since March 20, 2010 due to scleroderma, osteoarthritis, fibromyalgia, and diabetes. Awe's application was denied on June 29, 2010. On September 22, 2010, her application was denied on reconsideration. On October 1, 2010, Awe requested an administrative hearing before an Administrative Law Judge ("ALJ"). On November 16, 2011, Awe appeared via video conference with her attorney before ALJ Jeffrey Marvel for an administrative hearing. Awe and vocational expert Roger F. Marquardt testified at the hearing. In a decision dated January 13, 2012, the ALJ denied Awe's claim. The ALJ determined that Awe was not entitled to disability insurance benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Awe appealed the ALJ's decision. On March 12, 2013, the Appeals Council denied Awe's request for review. Consequently, the ALJ's January 13, 2012 decision was adopted as the Commissioner's final decision.

On June 19, 2013, Awe filed this action for judicial review. The Commissioner filed an Answer on August 23, 2013. On October 15, 2013, Awe filed a brief arguing that there is no substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On December 13, 2013, the Commissioner filed a

responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On December 23, 2013, Awe filed a reply brief. On July 23, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that

3

decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Awe's Education and Employment Background

Awe was born in 1966. She is a high school graduate. Following high school, Awe earned a post-secondary degree in accounting. The college level course-work took one-and-one-half years to complete.

The record contains a detailed earnings report for Awe. The report covers the time period from 1981 to 2009. Awe had minimal earnings in 1981 (less than $100). From 1982 to 1996, she earned between $337.41 (1990) and $9,401.98 (1993). She had no earnings in 1997 and 1998. From 1999 to 2009, Awe earned between $2,540.91 (1999) and $26,402.36 (2009). She has no earnings since 2010.

### B. Administrative Hearing Testimony

#### 1. Awe's Testimony

At the administrative hearing, the ALJ asked Awe why she believed she is unable to work. Awe replied that "I have neuropathy in all four of my limbs, and it's really severe, especially in my feet. I can't stand in one place for more than 15 minutes. . . . I can't, like -- for my hands, I can't pinch, and I can't, like, unscrew a cap. I've got all that kind of stuff."[1] The ALJ and Awe also discussed how Awe's difficulties with scleroderma[2] limit her ability to work:

> Q: Okay. Tell me a little bit about the scleroderma that you've been diagnosed with. What sort of symptoms do you have as a result of that?
> 
> A: I was diagnosed back in '96. Originally I had gone in to the doctor and told her that it was my hands that I couldn't get flat on the table. So she did a pathology test and found out that it was indeed scleroderma. I have sores all over my body from where the skin breaks

---

[1] Administrative Record at 41.

[2] Scleroderma is the chronic hardening and thickening of the skin. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1679 (32nd ed. 2012).

5

>                    open. And my whole body is scarred up because of it.
>                    And it makes it really difficult to move. My stomach
>                    is hard. I can't bend over to pick stuff up off the
>                    floor. . . .
> Q:                 What else is difficult to do . . .?
> A:                 It's -- has affected my entire body. With my ankles,
>                    they -- I have to keep stretching them, because
>                    otherwise if they, like, form into one position, then I
>                    have a hard time getting them moving again. And same
>                    with my knees. When I get, like, behind my knees,
>                    then I have to wear leg braces at night to get my legs
>                    straight again so that I can walk. I also have a brace
>                    for my elbows. And it has affected every part of my
>                    body, including my back and my butt. It's very hard to
>                    move. It's very hard to -- very hard to maintain. . . .

(Administrative Record at 43-44.)

Next, the ALJ asked Awe to discuss her difficulties and symptoms associated with fibromyalgia. Awe indicated that due to fibromyalgia, she is "just in pain the majority of the time."[3] She stated that her fibromyalgia was most painful at night. She further stated that doctors have her on pain medication all day long.

The ALJ also inquired about Awe's functional abilities:

> Q:                 For how far can you walk or for what length of time
>                    could you walk without having to stop and rest?
> A:                 Probably a block.
> Q:                 What about standing in one place, not walking but
>                    standing? For how long could you do that before you'd
>                    have to sit down?
> A:                 Probably 15 minutes.
> Q:                 And what about sitting in a chair like you're sitting in
>                    now? For how long could you do that?
> A:                 Maybe 45 [minutes]. . . .
> Q:                 So you don't think you could do a sitting job because
>                    after about 45 minutes you'd have to get up and move
>                    around?

---

[3] Administrative Record at 47.

> A: Right. And I would be in pain after sitting.
> Q: If you have to get up and move around after you're sitting for around 45 minutes, for how long do you have to be up and moving around before you return to your seated position?
> A: Probably 10 minutes. . . .

(Administrative Record at 49-50.) The ALJ also asked Awe about her daily activities. Awe testified that she takes her children to school in the morning, and picks them up after school, but otherwise spends her day taking care of herself. During the day, she usually spends about three hours resting and lying down. Awe stated that she is unable to do laundry, and her husband does the dishes. Awe also explained that she and her husband generally start making dinner together, but as she gets "worn out," he takes over and finishes making the evening meal. Lastly, she stated that she has difficulty carrying or holding a gallon of milk because her hands "freeze up." Awe concluded that "I pretty much don't do a whole lot at home."[4]

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with a hypothetical for an individual who:

> could occasionally lift 20 pounds and frequently lift 10 pounds, who could stand and walk six hours out of an eight-hour day, who could sit for six hours out of an eight-hour day; who could occasionally balance, stoop, crouch, kneel, crawl, and climb; who should avoid concentrated exposure to extreme heat and extreme cold.

(Administrative Record at 61.) The vocational expert testified that under such limitations, Awe could perform her past work as fast food services manager and fast food worker.

Next, the ALJ asked whether altering the individual's walking and standing requirements from six hours in an eight-hour day to two hours in an eight-hour day would

---

[4] Administrative Record at 51.

7

allow the individual to perform her past relevant work. The vocational expert responded that such a limitation would preclude past work. According to the vocational expert, however, with that added limitation, Awe could perform the following semi-skilled sedentary jobs: (1) telephone solicitor (5,900 positions in Iowa and 345,000 positions in the nation), (2) identification clerk (1,000 positions in Iowa and 155,000 positions in the nation), and (3) data examination clerk (430 positions in Iowa and 46,000 positions in the nation). The vocational expert also testified that Awe could perform the following unskilled sedentary jobs: (1) surveillance systems monitor (400 positions in Iowa and 10,000 positions in the nation), (2) charge account clerk (725 positions in Iowa and 100,000 positions in the nation), and (3) order clerk (2,000 positions in Iowa and 240,000 positions in the nation).

Returning to the initial hypothetical, the ALJ inquired whether adding a limitation of occasional handling and fingering would allow for the performance of past relevant work. The vocational expert stated that Awe's past work would be precluded, but she could perform the following light work: (1) rental consultant (4,000 positions in Iowa and 448,000 positions in the nation), (2) usher (535 positions in Iowa and 53,000 positions in the nation), and (3) chaperone (220 positions in Iowa and 32,000 positions in the nation). Lastly, the ALJ asked whether the additional limitations of two or more absences per month, the need for more than two unscheduled breaks, and the need to work at a slow pace for up to one-third of a workday would allow for employment. The vocational expert responded that such limitations would preclude competitive employment.

### C. Awe's Medical History

On May 5, 2010, Awe met with Dr. Joseph Gilg, M.D., regarding generalized morphea, a localized or limited form of scleroderma. In reviewing her medical history and current complaints, Dr. Gilg noted that:

> [Awe] had history of fibromyalgia and still has some discomfort in upper back, neck, and lateral hips although not

> taking any medication for that [] currently. She has only
> milder diffuse pain at this point. She returns today because of
> return of some problem with tightness of skin. . . . She had
> been on methotrexate from 1996 until she stopped the
> medication in October of 2007 on her own. She had not
> started back on the medication when I saw her in May of 2008
> although was still doing quite well at that time. . . . She
> reports that her skin continued to do well until the last 4-6
> months. As time has proceeded she has some gradual
> tightening of skin on the back of the neck, lower abdomen, and
> the distal lower extremities although not seeming to involve the
> toes or feet.

(Administrative Record at 272.) Upon examination, Dr. Gilg diagnosed Awe with generalized morphea of profunda variety with tightness of skin on the lower abdomen, lower extremities, and posterior neck. Dr. Gilg also diagnosed a "component" of fibromyalgia, diabetes, hypertension, and hyperlipidemia. Dr. Gilg prescribed methotrexate as treatment.

On June 29, 2010, Dr. Laura Griffith, D.O., reviewed Awe's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Awe. Dr. Griffith determined that Awe could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Awe could occasionally climb, balance, stoop, kneel, crouch, and crawl. Additionally, Dr. Griffith opined that Awe should avoid concentrated exposure to extreme cold or extreme heat. Dr. Griffith found no manipulative, visual, or communicative limitations.

On March 18, 2011, Awe met with Dr. Alan Braun, M.D., for a rheumatology consultation. In reviewing her medical history, Dr. Braun noted that:

> in 1996 [Awe] developed problems with her hands, such that
> she was unable to fully extend them. She also says that she

> had 'yellow spots' on her upper arms. Skin biopsy was done
> at the time and she was told that she has morphea. She has
> had off and on problems with this ever since and currently
> describes tightness involving the skin of hands, lower legs, and
> feet.

(Administrative Record at 330.) Upon examination, Dr. Braun diagnosed Awe with morphea and fibromyalgia. Dr. Braun opined that Awe's morphea was "mostly but not entirely healed. . . . She does not have evidence of systemic scleroderma. It is highly unusual for localized disease such as this to ever change into systemic disease."[5] Dr. Braun recommended the continued use of methotrexate as treatment.

On September 30, 2011, Awe underwent an MRI of her lumbosacral spine. Upon examination, Dr. Robert E. Berg, M.D., noted L5-S1 and L4-5 degenerative disc disease evidenced by disc desiccation, and L4-5 and L5-S1 hypertrophic facet arthropathy bilaterally with early L3-4 bilateral involvement. Dr. Berg diagnosed Awe with degenerative changes which are most pronounced at the L5-S1 disc and the lower lumbar facets.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Awe is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the
> claimant has a severe impairment, (3) whether the impairment
> meets the criteria of any Social Security Income listings,
> (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the

---

[5] Administrative Record at 331.

10

> impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. § 404.1520(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could

perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Awe had not engaged in substantial gainful activity since March 20, 2010. At the second step, the ALJ concluded from the medical evidence that Awe had the following severe impairments: morphea, diabetes, fibromyalgia, and peripheral neuropathy. At the third step, the ALJ found that Awe did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Awe's RFC as follows:

> [Awe] has the residual functional capacity to perform sedentary work . . . such that she can lift and carry twenty pounds occasionally and ten pound frequently. She can stand and walk two hours in an eight hour workday and sit for six hours in an eight hour workday. She can occasionally balance, stoop, kneel, crouch, crawl, and climb. She would need to avoid concentrated exposure to extreme cold and extreme heat.

(Administrative Record at 19.) Also at the fourth step, the ALJ determined that Awe was unable to perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Awe could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Awe was not disabled.

### B. Objections Raised By Claimant

Awe argues that the ALJ's RFC assessment is flawed and not supported by substantial evidence. First, Awe asserts that the ALJ failed to properly consider that she

12

has limited use of her hands. Second, Awe argues that the ALJ failed to properly consider her inability to stoop in making his RFC assessment for her. Lastly, Awe contends that the ALJ failed to consider limitations she has due to osteoarthritis in her left hip, and improperly found that her osteoarthritis was a non-severe impairment. Awe concludes that this matter should be reversed and remanded for an award of benefits; or in the alternative, reversed and remanded for further development of the record.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

An ALJ also has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618; *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and

13

the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

Having reviewed the entire record, the Court finds that the ALJ properly considered Awe's medical records, observations of treating physicians, and Awe's own description of her limitations in making the ALJ's RFC assessment for Awe.[6] *See Lacroix*, 465 F.3d at 887. For example, while Awe correctly points out that in April 2011, a treating source noted that EMG studies showed bilateral carpal tunnel syndrome and bilateral cubital tunnel syndrome, that same treating source did not diagnose Awe with either bilateral carpal tunnel syndrome or bilateral cubital tunnel syndrome.[7] Other than medication for fibromyalgia and ulnar nerve paresis, the treating source did not recommend any treatment for bilateral carpal tunnel syndrome or bilateral cubital tunnel syndrome. Moreover, the record contains no opinions from any medical source limiting Awe due to bilateral carpal tunnel syndrome or bilateral cubital tunnel syndrome. Accordingly, the Court determines that the ALJ's RFC assessment is not flawed because he did not find limitations on Awe's use of her hands. In drawing this conclusion, the Court bears in mind that while an ALJ is required to fully and fairly develop the record, he or she "'is not required to discuss every piece of evidence submitted.'" *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). Furthermore, failure of an ALJ to cite specific evidence is not an indication that he or she failed to consider such evidence. *Id.*

---

[6] *See* Administrative Record at 19-23 (discussion in the ALJ's decision of the relevant medical evidence and the credibility of Awe's subjective allegations of disability).

[7] Administrative Record at 328.

14

Similarly, Awe's assertion that she is unable to stoop is not supported by substantial evidence. Awe supports her claim by directing the Court to an X-ray taken in September 2011, after the ALJ's decision, in which Dr. Berg found "[d]egenerative changes which are most pronounced at the L5-S1 disk and the lower lumbar facets."[8] While there is evidence in the record that Awe suffers from degenerative changes in her back, in addition to her diagnosis of fibromyalgia, the record contains no opinion from a treating, examining, or non-examining source that Awe is unable to stoop due to her degenerative changes, fibromyalgia, or any other reason. Moreover, in thoroughly considering the evidence in the record, the ALJ determined that Awe was limited to "occasional" stooping.[9] Accordingly, the Court determines that the ALJ's RFC assessment is not flawed with regard to the issue of Awe's ability to stoop.

Lastly, Awe's contention that the ALJ erred by not finding the osteoarthritis in her left hip to be a severe impairment because she "made clear from early on that she was struggling with hip pain" and a treating physician diagnosed her with osteoarthritis is

---

[8] *Id.* at 379. The Court notes that the September 2011 X-ray was presented to the Appeals Council at the administrative level when requesting review of the ALJ's decision. Thus, under such circumstances, the Eighth Circuit Court of Appeals directs the reviewing court to consider the new evidence as part of the administrative record. *See Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008) (The final decision of the Commissioner should be affirmed if the decision "is supported by substantial evidence on the record as a whole, including the new evidence that was considered by the Appeals Council."); *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992) ("The newly submitted evidence is to become part of what we will loosely describe as the 'administrative record,' even though the evidence was not originally included in the ALJ's record. . . . If, as here, the Appeals council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision."). Accordingly, the Court will consider the September 2011 X-ray in determining whether the ALJ's decision is based on substantial evidence.

[9] *See* Administrative Record at 19 (ALJ's RFC assessment limiting Awe to occasional stooping).

without merit.[10] In her brief, Awe offers nothing more than a conclusory argument, in which she states "[t]he ALJ's summary conclusion that the osteoarthritis of the left hip is non-severe because it does not cause significant limitation in Mrs. Awe's ability to perform basic work activity is contrary to the evidence in record."[11] Awe offers no argument for how or why her left hip osteoarthritis is a severe impairment. Furthermore, Awe offers no argument for how or why the ALJ's finding that her left hip osteoarthritis is not a severe impairment is contrary to the evidence in record. Moreover, there is no evidence in the record from any medical source placing any limitations on Awe due to osteoarthritis. For example, Dr. Ogaard, D.O., who diagnosed Awe with left hip osteoarthritis, recommended she undergo physical therapy and/or exercise to treat her hip pain, but found no limitations due to her hip pain.[12] Because the Court finds no evidence in the record that shows the ALJ erred with respect to evaluating the medically determinable nature or severity of Awe's impairments, and Awe has not pointed to any such evidence, the Court concludes that the ALJ did not err in finding Awe's osteoarthritis to be a non-severe impairment. *See Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007) ("Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that claimant failed to make this showing.").

In summary, having reviewed the entire record, the Court finds that the ALJ properly considered Awe's medical records, observations of treating physicians, and Awe's own description of his limitations in making his RFC assessment for Awe.[13] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based

---

[10] Awe's Brief (docket number 10) at 12.

[11] Awe's Brief (docket number 10) at 12.

[12] *See* Administrative Record at 281.

[13] *Id.* at 18-23.

on a fully and fairly developed record. *See Cox*, 495 F.3d at 618. Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ fully and fairly developed the record with regard to the medical evidence in the case, and made a proper RFC assessment for Awe. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby ORDERED:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 25th day of April, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA